CHRISTOPHER R. *v.* COMMISSIONER OF
MENTAL RETARDATION
(SC 17318)

Sullivan, C. J., and Norcott, Katz, Palmer and Vertefeuille, Js.

Argued January 11—officially released April 4, 2006

*M. J. McCarthy*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney

general, and *Richard J. Lynch*, assistant attorney general, for the appellant (defendant).

*Paulette G. Annon*, for the appellee (plaintiff).

*Sandra A. Trionfini* filed a brief for the Connecticut Legal Services, Inc., et al. as amici curiae.

*Opinion*

KATZ, J. The defendant, the commissioner of mental retardation, appeals from the judgment of the trial court sustaining the appeal of the minor plaintiff, Christopher R.,[1] brought through his father, James R., from the defendant's decision concluding that the plaintiff is not eligible for services from the department of mental retardation (department) on the ground that the level of his intellectual functioning does not meet the definition of mental retardation as set forth in General Statutes (Rev. to 2003) § 1-1g.[2] The defendant contends that

[1] The plaintiff filed a motion to seal the record submitted to this court in light of his privacy interest in psychological and medical evaluations contained therein. We granted the motion. The trial court granted a similar motion to seal the record before it.

[2] General Statutes (Rev. to 2003) § 1-1g provides: "(a) For the purposes of sections 4a-60, 17a-274, 17a-281, 38a-816, 45a-669 to 45a-684, inclusive, 46a-51, 53a-59a, 53a-60b, 53a-60c and 53a-61a, mental retardation means a significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period.

"(b) As used in subsection (a), 'general intellectual functioning' means the results obtained by assessment with one or more of the individually administered general intelligence tests developed for that purpose and standardized on a significantly adequate population and administered by a person or persons formally trained in test administration; 'significantly subaverage' means an intelligence quotient more than two standard deviations below the mean for the test; 'adaptive behavior' means the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected for the individual's age and cultural group; and 'developmental period' means the period of time between birth and the eighteenth birthday."

In 2005, a minor technical change was made to § 1-1g that is not relevant to this appeal. See Public Acts 2005, No. 05-288, § 1. We refer herein to the revision of the statute in effect at the time of the proceedings.

the trial court improperly concluded that the department lacked authority under § 1-1g to deny the plaintiff's application for eligibility for services on the ground that the plaintiff had submitted one intelligence test meeting the statutorily mandated threshold score and otherwise met eligibility criteria. Specifically, the defendant contends that the trial court improperly concluded that the department is not statutorily authorized to consider: (1) the individual test score components, rather than the combined, full scale score; (2) intelligence tests previously taken by the plaintiff; and (3) whether the plaintiff's psychiatric disorders may have affected his test scores. We conclude that the defendant did not exceed his statutory authority and that the decision denying the plaintiff's application was supported by substantial evidence. Accordingly, we reverse the trial court's judgment sustaining the plaintiff's appeal.

The record reveals the following undisputed facts and procedural history. In 2002, the plaintiff was fifteen years old and attending public high school, where he was receiving special education services. In January, 2002, a school psychologist administered to the plaintiff several tests, including a Weschler Intelligence Scale for Children—III Edition (WISC-III test).[3] That test yielded the following intelligence quotient (IQ) scores: a verbal IQ of eighty, a performance IQ of fifty-seven and a combined, full scale IQ of sixty-six. A general

---

[3] According to Michael Westerveld, a clinical neuropsychologist at the Yale University School of Medicine who administered an earlier WISC-III test to the plaintiff: "The WISC-III is a battery of tasks which provides estimates of ability in various domains of cognitive functioning. The WISC-III contains two scales, the [v]erbal scale and the [p]erformance scale. The [v]erbal scale measures language expression, comprehension, listening, and the ability to apply these skills to solving problems. The examiner gives the question orally, and a spoken response is required. The [p]erformance [s]cale assesses nonverbal problem solving, perceptual organization, speed, and visual-motor proficiency. Included are tasks like puzzles, analysis of pictures, imitating designs, and copying. A third index, the [f]ull [s]cale IQ, provides a composite of the [v]erbal and [p]erformance [s]cales."

IQ below seventy is considered indicative of mental retardation. See General Statutes (Rev. to 2003) § 1-1g (b) (defining mental retardation in part to require "an intelligence quotient more than two standard deviations below the mean for the test"); see also American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th Ed. 1994) pp. 39–40. On the basis of that test and other evidence indicating that the plaintiff's adaptive behavior was deficient, James R. applied to the defendant for services for the plaintiff.

Thereafter, pursuant to the department's regulations; see Regs., Conn. State Agencies § 17a-212-2; two of the department's psychologists reviewed the plaintiff's file to make an initial determination of eligibility. One of those psychologists, H. Steven Zuckerman, thereafter notified James R. that the department had determined that the plaintiff did not meet the statutory definition of mentally retarded and, therefore, was not eligible for services. Zuckerman noted that this determination was based on the disparity between the plaintiff's verbal and performance scores on the 2002 WISC-III test and on other tests on which the plaintiff previously had scored within a normal or average range, beginning at age eight. To contest that determination, the plaintiff thereafter invoked his right, under General Statutes § 17a-210 (d), to a hearing. At the hearing, James R. argued that the plaintiff's IQ scores and adaptive behavior scores supported a diagnosis consistent with the department's eligibility criteria. He testified regarding the plaintiff's lack of self-direction and offered evidence regarding the plaintiff's day-to-day dependence on family and school professionals. Zuckerman, who testified for the department, agreed that the plaintiff had numerous support needs, but contended that there was formal documentation that the plaintiff's verbal cognitive abilities had been in the low normal to normal range since age eight.

After considering the testimony and the considerable documentary evidence, including prior intelligence tests and psychological, medical and social evaluations,[4] the department's hearing officer issued a proposed decision concluding that the plaintiff was ineligible for services. Specifically, with respect to the adaptive behavior criterion for eligibility, the hearing officer found that the plaintiff's behavior consistently had been in the requisite deficit range. The hearing officer further found, however, that this adaptive behavior deficit was not accompanied by the required statutory subaverage general intellectual ability. In support of the latter conclusion, the hearing officer found that: (1) only one intelligence test out of several such tests that the plaintiff had taken—the 2002 WISC-III test—resulted in an IQ score in the range of mental retardation; (2) although the 2002 test reflected full scale and performance scores in the mental retardation range, it was more likely that the verbal score was a more accurate reflection of the plaintiff's intellectual level; and (3) there was an absence of any formal diagnostic reference to mental retardation by any of the medical, psy-

---

[4] The department's exhibits included: Zuckerman's initial determination explaining the reasons for denying eligibility; a March, 2002 school psychologist's report; a January, 2002 triennial public school evaluation that included the 2002 WISC-III test results; a 1999 social and cultural assessment by the Fairfield county public schools; a 1998 Fairfield county public school psychological evaluation; a 1998 genetics consultation report from the Yale University School of Medicine; an undated clinical neuropsychological evaluation of the plaintiff at age eleven that included a WISC-III test conducted at the Yale University School of Medicine; and a 1995 evaluation report that included a 1994 Kaufman Assessment Battery for Children (Kaufman test) administered by the Yale University Child Study Center. Although the clinical neuropsychological evaluation was not dated, based on the plaintiff's age at the time of the evaluation, for purposes of clarity, we refer to the test referenced therein as the 1997 WISC-III test.

The plaintiff's exhibits included: a July, 2002 letter from the plaintiff's special education teacher concluding that the plaintiff's placement in special education was appropriate for the 2002–2003 school year; and a 2002 high school performance graduation expectation report.

chological or educational professionals who had evaluated the plaintiff, but who instead varyingly had diagnosed the plaintiff as having a learning disability, obsessive compulsive disorder and pervasive developmental disorder.[5] Among the evidence cited in support of these findings, the hearing officer noted that the school psychologist who had administered the plaintiff's January, 2002 triennial evaluation; see footnote 4 of this opinion; had opined that certain of the plaintiff's low test scores were consistent with persons having these disorders. The hearing officer recognized that the evidence also indicated that the plaintiff has numerous difficulties and complex needs, but concluded that mental retardation was not the cause of those problems.

The plaintiff appealed from the proposed decision to the defendant, requesting that the defendant either reverse that decision or schedule another hearing so that the plaintiff could present additional evidence. After reviewing the record, the defendant issued a final decision notifying the plaintiff that he concurred with the hearing officer's decision denying eligibility.

Pursuant to General Statutes § 4-183, the plaintiff appealed from the defendant's decision to the Superior Court, which sustained the appeal.[6] The trial court first

---

[5] To be precise, the plaintiff was diagnosed as having "pervasive developmental disorder not otherwise specified," one of several recognized types of that disorder. See Diagnostic and Statistical Manual of Mental Disorders, supra, p. 65. "This category [is] used when there is a severe and pervasive impairment in the development of reciprocal social interaction or verbal and nonverbal communication skills, or when stereotyped behavior, interests, and activities are present, but the criteria are not met for a specific Pervasive Developmental Disorder, Schizophrenia, Schizotypal Personality Disorder, or Avoidant Personality Disorder." Id., pp. 77–78.

[6] The plaintiff's complaint indicates that he challenged only the defendant's decision denying his application. The plaintiff apparently did not contest the defendant's implicit denial of his request for another hearing to present additional evidence by seeking, in the alternative, an order, pursuant to § 4-183 (h), remanding the case to the defendant for such a rehearing. Moreover, the plaintiff has not contested on appeal to this court the defendant's decision implicitly denying his request for that hearing.

examined the statutory scheme, specifically, the definition of mental retardation under § 1-1g and the legislature's grant of authority to the defendant under General Statutes § 17a-212[7] to promulgate regulations establishing eligibility criteria for the department's services. The court concluded that the authority vested in the defendant did not allow it to restrict the "plain meaning" of the definition of mental retardation. In the trial court's view, § 1-1g required the defendant to find an applicant eligible for services if: (1) that applicant had submitted a *single*, properly administered IQ test with a full scale score below seventy; (2) his intellectual deficiency existed concurrently with deficits in adaptive behavior; and (3) these deficiencies manifested before the applicant reached age eighteen. The court reasoned that, within these requirements, the defendant has discretion in assessing whether a particular type of test would provide an acceptable measure of general intelligence and in assessing an applicant's adaptive behavior. The court noted that these elements were not in dispute in the present case. The court further reasoned that, when a general intelligence test score complies with the statutory requirements, the defendant does not have discre-

---

[7] General Statutes § 17a-212 provides: "(a) On or before September 30, 1991, the Commissioner of Mental Retardation shall adopt regulations, in accordance with the provisions of chapter 54, establishing (1) criteria for (A) determining eligibility for services provided by the department, (B) determining which clients shall receive a specific service and (C) selecting private sector service providers and (2) uniform procedures to be used by the regional offices in determining which clients shall receive services and in selecting private sector service providers. Such procedures shall specify the decision-making authority of the department's central office and the regional offices and set parameters within which each shall operate.

"(b) Each regional office, following a format developed by the department's central office and taking into account the regulations developed by the commissioner, shall prepare a written protocol to be used in determining which clients shall receive services and in selecting service providers. The protocol shall be approved by the commissioner.

"(c) The department shall evaluate each region's adherence to its approved protocol."

tion to consider any other evidence. Thus, it concluded that the department's "preference of the verbal IQ to the general IQ, exclusion of [the plaintiff] from the system because of coexisting mental disorders and reliance on the fact that [the plaintiff] had not previously been determined to be mentally retarded all exceeded the legal authority of [the department] . . . ." This appeal followed.[8]

The defendant claims that the trial court improperly concluded that he had exceeded his statutory authority. Relying specifically on § 17a-212 and generally on § 1-1g, he contends that the legislature vested in him discretion to determine an applicant's eligibility. The defendant further contends that, "judgment and interpretation are . . . required in the application of the definition [of mental retardation] when, as in this case, there are both mixed results on standardized intellectual testing, and the presence of confounding variables, diagnoses, and other factors [that] may artificially depress IQ scores." The defendant thus claims both that he did not abuse his discretion by considering the other intelligence test scores, the partial components of the tests and the effect that the plaintiff's mental disorders may have had on his test scores and that, in light of this evidence, his decision denying eligibility was supported by substantial evidence.

In response, the plaintiff contends that § 1-1g requires that the defendant deem an applicant eligible for services upon the submission of a single, appropriately administered general intelligence test with a full scale score below seventy. Therefore, according to the plain-

[8] The defendant appealed from the judgment of the trial court to the Appellate Court. The plaintiff thereafter filed a motion, pursuant to Practice Book § 65-2, seeking to transfer the appeal to this court. We transferred the case from the Appellate Court to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1, and, accordingly, took no action on the plaintiff's motion to transfer.

tiff, the trial court properly concluded that the defendant improperly had considered other tests and collateral matters. For substantially the same reasons stated by the defendant, we conclude that the trial court improperly sustained the plaintiff's appeal.

According to our well established standards, "[r]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . [A]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts. . . . It is well settled [however] that we do not defer to the board's construction of a statute—a question of law—when, as in the present case, the [provisions] at issue previously ha[ve] not been subjected to judicial scrutiny or when the board's interpretation has not been time tested."[9] (Citations

---

[9] The defendant contends that the department's interpretation of § 1-1g has in fact been time tested since 1983. The only evidence the defendant has submitted to this court that could support his contention, however, are two Superior Court cases that reflect that the department considered in those cases the same kind of evidence it considered in the present case— multiple test scores, test score components and collateral evaluations. Two isolated cases do not indicate a time tested interpretation. Cf. *Hartford* v. *Hartford Municipal Employees Assn.*, 259 Conn. 251, 268, 788 A.2d 60 (2002) (deferring to board of labor relations' interpretation to resolve possible ambiguity when board had presented evidence of consistent interpretation of statute for more than twenty-five years). Moreover, we do not consider these two cases cited by the defendant to constitute the kind of judicial scrutiny that similarly could require deference to an agency's interpretation. In neither case did the court employ the full panoply of tools of statutory construction, a threshold requirement to warrant such deference. Furthermore, we question whether it would be appropriate in any event to defer

omitted; internal quotation marks omitted.) *JSF Promotions, Inc.* v. *Administrator, Unemployment Compensation Act*, 265 Conn. 413, 417–18, 828 A.2d 609 (2003). In such a case, our review of those provisions is plenary. Id., 418.

As an initial matter, we note that, in framing his claim, the defendant relies principally on § 17a-212 as a broad source of discretion, allowing him to consider whatever evidence he deems relevant and to exercise his judgment accordingly in determining eligibility. We view the issue before us through a slightly different lens, however, in light of the nature of and relationship between §§ 17a-212 and 1-1g. We therefore begin by briefly explaining that relationship as it bears on this appeal.

The legislature first set forth the broad definition of "mental retardation" currently found in subsection (a) of § 1-1g in 1978. Public Acts 1978, No. 78-148, § 1. In 1982, the legislature amended the statute essentially to reflect its current form, adding subsection (b), which further defines terms used in the broad definition under subsection (a). Public Acts 1982, No. 82-51, § 1. At that time, the legislature also limited the application of the definition set forth therein to specified provisions in the General Statutes. The only such enumerated provisions that apply to the department address voluntary and involuntary admissions to facilities for persons with mental retardation. See General Statutes (Rev. to 2003) § 1-1g (a) (providing that definition of mental retardation set forth therein applies to, inter alia, General Statutes §§ 17a-274 and 17a-281). Thus, by its own terms, § 1-1 does not apply to the department's decisions regarding eligibility for services. Nonetheless, it appears

to the department's interpretation of § 1-1g because the reach of that statute extends beyond the department to other agencies and to civil and criminal statutes. See footnote 2 of this opinion.

from the record that the department informally applied the three part definition of mental retardation under § 1-1g—considering intellectual functioning, adaptive behavior and age—to its eligibility decisions as of at least January, 1990. See Legislative Program Review and Investigations Committee, January, 1990 Management Audit: Department of Mental Retardation, pp. 8–9 (1990 Management Audit).[10]

In 1990, the legislature enacted § 17a-212. See Public Acts 1990, No. 90-164, § 2. It therein directed the defendant to promulgate regulations setting forth specific criteria for, inter alia, determining eligibility for the department's services.[11] Id. No other provision in the General Statutes addresses eligibility for such services. In response to that directive, in 1991, the defendant promulgated a regulation generally requiring that an

[10] The audit report by the legislative program review and investigations committee provided: "To be eligible for [the department's] services, a person must be a resident of the state and diagnosed as mentally retarded. By statute ([§] 1-1g [a]), mental retardation is defined as 'a significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period.'

"Thus, three elements must be present for an individual to be defined as mentally retarded and eligible to receive services from [the department]. They are:

"(1) retardation must occur prior to an individual's [eighteenth] birthday (during the developmental period);

"(2) the individual's behavior must be significantly below what is expected for someone of the same age in the same cultural group (deficits in adaptive behavior); and

"(3) the individual must have an intelligence quotient (IQ) of approximately [seventy] or less as measured by a standardized intelligence test (significantly subaverage intellectual functioning)." 1990 Management Audit, supra, pp. 8–9.

[11] The legislative program review and investigations committee that had recommended to the legislature that it require the department to promulgate such regulations explained: "Requiring the department to place in regulation[s] the criteria used in decision making accomplishes several important objectives. It allows for public comment on the regulations prior to adoption, provides a sense of permanence to the criteria, and places the department's policy in one source where the public can easily identify whether the rationale for a decision is legitimate." 1990 Management Audit, supra, pp. 65–66.

applicant for services be a resident of the state and a person with mental retardation; see Regs., Conn. State Agencies § 17a-212-2 (b); defining that term to mean "mental retardation as defined in [§] 1-1g . . . ."[12] Id., § 17a-212-1 (10).

Thus, although the defendant was not mandated statutorily to determine eligibility in accordance with § 1-1g, the defendant necessarily assumed such an obligation by adopting a regulation that incorporated the statutory definition of mental retardation. We, therefore, do not view the issue as whether the defendant is authorized under § 17a-212 to consider any evidence that could be relevant in assessing general intellectual functioning. Rather, we view the threshold issue before us as whether, consistent with § 1-1g, the defendant may consider more than one general intelligence test to determine whether an applicant is mentally retarded and, therefore, is eligible for the department's services. If so, we then consider whether the defendant exceeded his authority by considering evidence other than the general intelligence test full scale scores when confronted with conflicting results.[13] Finally, we must con-

---

[12] The pertinent regulations provide in full as follows. Section 17a-212-2 (b) of the Regulations of Connecticut State Agencies provides: "Criteria for Determining Eligibility

"A person is eligible for services of the department if he:

"(1) is a resident of the State of Connecticut; and

"(2) has mental retardation.

"A person who has not met these criteria may be eligible for such services of the department as are expressly authorized by State or Federal law."

Section 17a-212-1 of the Regulations of Connecticut State Agencies provides in relevant part: "For the purposes of Sections 17a-212-1 through 17a-212-5, inclusive, the following definitions shall apply . . .

"(10) 'Mental retardation' means mental retardation as defined in section 1-1g of the Connecticut General Statutes and includes persons under the age of five who have substantial developmental delay or a specific diagnosed condition with a high probability of resulting in developmental delay, but for whom a determination of mental retardation is not possible. . . ."

[13] Thus, we underscore that we do not consider whether, in a case in which all IQ tests available for the department's consideration have full scale scores below seventy, the defendant nevertheless properly may consider the

sider whether, in light of the evidence properly before the department, there is substantial evidence to support its decision.

Turning to the threshold question, therefore, we consider whether § 1-1g authorizes the defendant to consider more than one intelligence test. "We approach this question according to well established principles of statutory construction designed to further our fundamental objective of ascertaining and giving effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, [and] to the legislative policy it was designed to implement . . . ."[14] (Internal quotation marks omitted.) *Williams* v. *Commission on Human Rights & Opportunities*, 257 Conn. 258, 270, 777 A.2d 645 (2001).

Section 1-1g defines mental retardation as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period." General Statutes (Rev. to 2003) § 1-1g (a). That section further defines " 'general intellectual functioning' " as "the results obtained by assessment with *one or more of the individually administered general intelligence*

test component scores separately, other tests that do not constitute a "general intelligence" test, as that term is used in § 1-1g, or other collateral evidence.

[14] We are mindful of the fact that General Statutes § 1-2z requires that, before we go beyond the text of a statute to determine its meaning, we first must determine that it is not plain and unambiguous. See *Bell Atlantic NYNEX Mobile, Inc.* v. *Commissioner of Revenue Services*, 273 Conn. 240, 250–51 n.13, 869 A.2d 611 (2005). Neither party points to any statutory language that plainly and unambiguously addresses the issue in this appeal. Indeed, the meaning of the language on which we do rely in § 1-1g— addressing "one or more" tests—only becomes evident after applying our rules of statutory construction and considering the legislative history. Therefore, we are free to turn to extratextual sources when examining the meaning of § 1-1g as applied to the facts of this case.

*tests* developed for that purpose and standardized on a significantly adequate population and administered by a person or persons formally trained in test administration . . . ." (Emphasis added.) General Statutes (Rev. to 2003) § 1-1g (b).

In determining the meaning of § 1-1g, we are guided by certain fundamental rules of statutory construction. "[S]tatutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant . . . ." (Internal quotation marks omitted.) *Semerzakis* v. *Commissioner of Social Services*, 274 Conn. 1, 18, 873 A.2d 911 (2005). By construing the phrase "one or more" to mean that *more than one* general intelligence test should be considered, if available, we give effect to each word in the statute. By contrast, in order to adopt a construction under which an applicant must be deemed mentally retarded upon submitting one test with a full scale score below seventy, irrespective of other test scores—we would have to read words "or more" out of the statute. Indeed, we essentially would have to read the phrase as if it stated "at least one" general intelligence test, instead of "one or more" intelligence tests. This court, however, will not substitute language for that chosen by the legislature. See *Echavarria* v. *National Grange Mutual Ins. Co.*, 275 Conn. 408, 416–17, 880 A.2d 882 (2005) ("[t]he court . . . cannot read something into a statute . . . nor can it substitute its judgment of what would constitute a wiser provision for the clearly expressed intent of the legislature" [internal quotation marks omitted]); *Laliberte* v. *United Security, Inc.*, 261 Conn. 181, 186, 801 A.2d 783 (2002) ("[w]e are bound to interpret legislative intent by referring to what the legislative text contains, not by what it might have contained" [internal quotation marks omitted]).

Moreover, "[i]n construing a statute, common sense must be used and courts must assume that a reasonable

and rational result was intended." (Internal quotation marks omitted.) *Rocco* v. *Garrison*, 268 Conn. 541, 550, 848 A.2d 352 (2004). Consider, therefore, a hypothetical situation in which an applicant has taken four general intelligence tests over a period of several years, with the three most recent tests reflecting full scale scores of ninety, and the earliest test reflecting a full scale score of sixty-nine.[15] It would be illogical to require that the department deem an applicant eligible for services, as the plaintiff contends, simply because of one anomalous test score.

Although there is no legislative history that directly bears on this issue, it is noteworthy that comments during the debate on the 1982 bill adding subsection (b) to § 1-1g indicate that the legislature intended to clarify and narrow the definition of mental retardation to ensure that persons with borderline normal intelligence were not classified as mentally retarded, to prevent inappropriate commitment of such persons to mental retardation facilities and to ensure that limited administrative resources were devoted to those most in need. See 25 H. Proc., Pt. 2, 1982 Sess., pp. 408–10, 413–14. Interpreting § 1-1g to allow consideration of all intelligence tests that meet the statutory criteria best furthers those purposes. Moreover, mindful that this definition applies to other statutes; see footnote 2 of this opinion; we are persuaded that this interpretation reasonably may be applied in those contexts as well. Accordingly, we conclude that the defendant did not exceed his authority when considering all available general intelligence tests.

We note that the record is not entirely clear as to which of the several tests in the record the defendant

---

[15] Apparently, it is not uncommon for persons seeking the department's services to have taken several intelligence tests. See, e.g., *Martinez* v. *O'Meara*, Superior Court, judicial district of New Britain, Docket No. CV00499604 (April 30, 2001) (discussing four intelligence tests taken by that plaintiff).

deemed, in accordance with § 1-1g, "general intelligence" tests, namely, a test developed for the purpose of assessing general intelligence that has been standardized on a significantly adequate population. See General Statutes (Rev. to 2003) § 1-1g (b). "Attachment A" to the defendant's eligibility criteria,[16] however, explains that "[t]ypical IQ tests that can be considered include the Stanford-Binet Test of Intelligence, and the [WISC-III] . . . ." Of those two types of tests, the record includes two WISC-III tests administered to the plaintiff, one administered in 2002 and one administered in 1997. As we have noted previously, the 2002 test resulted in a full scale score of sixty-six, a verbal score of eighty and a performance scale of fifty-seven. The 1997 test resulted in a full scale score of seventy-three, a verbal score of eighty-two and a performance score of sixty-nine. Although the full scale scores on the two tests differed by a mere seven points, under § 1-1g that difference has enormous significance in terms of qualifying for the department's services.

Thus, the defendant was confronted with conflicting tests results—one test with a full scale score below seventy, indicating significantly subaverage general intellectual functioning consistent with mental retardation under § 1-1g, and another test with a full scale score higher than seventy, indicating functioning above that level.[17] The defendant does not take the position

---

[16] Attachment A appears from the record to be one of several documents that the department provides to applicants seeking to be deemed eligible for services, in which the department sets forth information as to the approval process. The defendant has described this document as merely explanatory, and we do not ascribe the legal significance to this document that would be given to a duly promulgated regulation.

[17] The record also includes another test that possibly could have been considered by the department to be an appropriate general intelligence test—the 1994 Kaufman test. See footnote 4 of this opinion. The results of that test reflect that, although it is scored differently than the WISC-III test, the Kaufman test resulted in a "global" intelligence score, a verbal intelligence score and a nonverbal intelligence score. The Yale Child Study Center, which had administered the 1994 Kaufman test, indicated that the

that all of an applicant's general intelligence tests must meet the statutory criteria to be eligible for services. See footnote 13 of this opinion. We, therefore, consider whether, when faced with conflicting indications of the plaintiff's general intellectual functioning, the defendant exceeded his authority by considering other evidence. We conclude that he did not.

Faced with such conflicting scores, the defendant necessarily was required to make a determination as to whether the plaintiff's general intellectual functioning was in fact significantly subaverage. Nothing in the statutes or regulations limits the defendant's discretion in this regard, and the defendant is especially qualified to make such a determination. See General Statutes § 17a-210 (prescribing defendant's qualifications and duties); General Statutes § 17a-212 (conferring on defendant authority to determine criteria for eligibility). Indeed, we generally defer to an agency with expertise in matters requiring such a technical, case-by-case determination. See *MacDermid, Inc.* v. *Dept. of Environmental Protection*, 257 Conn. 128, 139, 778 A.2d 7 (2001).

As we have noted previously, such a factual determination must be sustained if it is reasonably supported by substantial evidence in the record taken as a whole. *Rocque* v. *Freedom of Information Commission*, 255 Conn. 651, 658–59, 774 A.2d 957 (2001). "This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an

---

test results had yielded a general mental processing score equivalent to an IQ score and classified the results as reflecting an overall intelligence score within the average range. Because, however, there is no finding indicating that the Kaufman test was considered by the defendant a general intelligence test in accordance with § 1-1g, and the defendant does not list that test in the examples of such acceptable tests in attachment A to its eligibility criteria, we do not ascribe that level of significance to this test.

agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . The reviewing court must take into account [that there is] contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence . . . ."[18] (Internal quotation marks omitted.) *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, 269 Conn. 57, 70, 848 A.2d 395 (2004).

Turning to that evidence, we note that Virginia Wohlstrom, the school psychologist who administered the 2002 WISC-III test highlighted several issues regarding the test results that reasonably were interpreted by the defendant to indicate that the 2002 full scale score understated the plaintiff's general intelligence. Wohlstrom concluded that the plaintiff's low performance score was reflective more of the fact that it took the plaintiff an excessive amount of time to complete his work, than that he actually was performing in the intellectually deficient range. She also noted that the plaintiff's verbal score was skewed downward because of a significantly weak score in a subtest measuring comprehension. Wohlstrom opined that the plaintiff's pervasive developmental disorder affected that score, and concluded that "[the plaintiff's] verbal functioning in non-

---

[18] Because the trial court concluded that the defendant had exceeded his authority under § 1-1g, it did not reach the issue of whether there was substantial evidence to support the defendant's finding that the plaintiff did not have significantly subaverage intellectual functioning. Nonetheless, we decide this issue because it presents a question of law and the record on appeal before us is the same as the one before the trial court. See *Dark-Eyes* v. *Commissioner of Revenue Services*, 276 Conn. 559, 569 n.10, 887 A.2d 848 (2006) ("[u]nder circumstances where the record presents the entire proceedings before the trial court, the question is essentially one of law, and we are in no different position than we would be in had the trial court answered it" [internal quotation marks omitted]).

social situations, such as the classroom, is in the [a]verage range." Wohlstrom also noted that the plaintiff was functioning at the upper level of his classes, typically getting B grades.[19]

Additionally, Wohlstrom's assessment—that the plaintiff's ability to function at a general intellectual level was higher than his full scale score of sixty-six—was consistent with other, earlier intelligence tests. A 1994 Kaufman test; see footnote 4 of this opinion; which is scored differently than the WISC-III test, was correlated to the more traditional intelligence tests to result in a "global intelligence" score of ninety-four, a verbal intelligence score of eighty-nine and a nonverbal intelligence score of ninety-three. See footnote 17 of this opinion. The Yale Child Study Center, which had administered the Kaufman test, classified the results as reflecting an overall intelligence score within the average range. In a 1998 social and cultural assessment, the plaintiff achieved a score of 103 on a Test of Nonverbal Intelligence-2, which is within the average range.

In his initial determination of ineligibility, Zuckerman, the department's psychologist, pointed to the plaintiff's 1994 Peabody Picture Vocabulary Test, on which the plaintiff scored in the normal range. According to Zuckerman, that test has greater than a 0.8 correlation to the WISC-III test. Zuckerman also found the plaintiff's average score on his 1998 Test of Nonverbal Intelligence-2 to be significant because, when that score was coupled with the plaintiff's verbal score of eighty on the 2002 WISC-III test and certain subtests within that verbal score that were within the low normal to normal range, "it is clear that [the plaintiff's] overall cognitive abilities are above what would be considered the mental retardation level." The plaintiff

---

[19] Wohlstrom's evaluation indicates that two of the plaintiff's classes were special education classes, but that the rest were mainstream classes.

presented no evidence to rebut Zuckerman's conclusions.

The defendant's decision to examine separately the verbal and performance scores, as well as subtests within those scores, is supported by an authoritative reference book on mental disorders submitted by the plaintiff. The Diagnostic and Statistical Manual of Mental Disorders, supra, p. 40, provides: "When there is significant scatter in the subtest scores, the profile of strengths and weaknesses, rather than the mathematically derived full-scale IQ, will more accurately reflect the person's learning abilities. When there is a marked discrepancy across verbal and performance scores, averaging to obtain a full-scale IQ score can be misleading." Consistent with that assessment, Michael Westerveld, the clinical neuropsychologist at the Yale University School of Medicine who had administered the plaintiff's 1997 WISC-III test, found the broad disparity between the plaintiff's verbal and performance scores to be clinically significant.

The record also reflected several psychological, social and medical evaluations over the years that varyingly had diagnosed the plaintiff as learning disabled, having pervasive developmental disorder and having obsessive compulsive disorder. In addition to Wohlstrom's 2002 assessment that one of these disorders may have impacted the plaintiff's test scores, Westerveld's 1997 assessment opined that the plaintiff's pervasive developmental disorder and his difficult social situation likely were factors in his decline in scores from prior evaluations. In its memorandum of decision, the trial court recognized that the record reflected that these disorders might have affected adversely the plaintiff's performance IQ, but concluded that the defendant lacked authority to consider such evidence. For the reasons previously set forth, it is clear that the defen-

dant in fact properly could have relied on such evidence under the facts of this case.

Moreover, although clearly not dispositive evidence in and of itself, the defendant was entitled to consider the absence of any reference to mental retardation in these numerous and wide-ranging evaluations. Notably, Zuckerman testified that he found this absence significant. The defendant was free therefore to infer, by their lack of reference to mental retardation, that none of the professionals conducting those evaluations had concluded that mental retardation was causative of the plaintiff's deficiencies. Although the plaintiff contends that such an inference was not reasonable given that the tests were not performed specifically to diagnose mental retardation, he did not submit evidence to demonstrate that the method by which the diagnoses were obtained necessarily would not have considered mental retardation.[20] Similarly, the plaintiff objects to this inference because "some schools may prefer the label 'learning disabled' to 'mental retardation' believing 'learning disabled' is less stigmatizing." That assertion may well be true, but the plaintiff did not submit evidence to the defendant indicating that the evaluators who actually performed the assessments used the terms learning dis-

---

[20] The brief of the amici, Connecticut Legal Services, Inc., the Connecticut Chapter of the American Association on Mental Retardation, Inc., and Arc/Connecticut, filed in support of the plaintiff, asserts that pervasive developmental disorder commonly is an associated disorder with mental retardation and cites to the Diagnostic and Statistical Manual of Mental Disorders as support for that proposition. That manual provides that "[pervasive developmental] disorders . . . are often associated with some degree of [m]ental [r]etardation . . . ." Diagnostic and Statistical Manual of Mental Disorders, supra, p. 65. Although that evidence could support a conclusion that mental retardation, rather than or as well as pervasive developmental disorder, affected the plaintiff's test scores, it also could support the conclusion that a professional rendering a diagnosis of that disorder also would be likely to note the presence of mental retardation. In the absence of expert testimony, we cannot say that the defendant improperly reached the latter conclusion.

abled or language delayed as a proxy for mental retardation.

We recognize that the defendant's regulations may not have put the plaintiff on notice that the department might draw such adverse inferences, but the plaintiff did not avail himself of remedies to supplement the record in that regard. See footnote 6 of this opinion. We further note that the evidence that the plaintiff has submitted to this court in support of his broader proposition that the stigmatizing effect of the label "mentally retarded" may prompt some professionals to avoid that term does not compel a contrary inference. Indeed, it must be emphasized that the plaintiff had the burden of establishing that he met the requirements of eligibility for the department's services. See *Matarazzo* v. *Rowe*, 225 Conn. 314, 323, 623 A.2d 470 (1993) (stating general rule that party seeking benefit ordinarily bears burden of establishing eligibility for such benefits), overruled in part on other grounds, *Ross* v. *Giardi*, 237 Conn. 550, 571, 680 A.2d 113 (1996); *Middlesex Memorial Hospital* v. *North Haven*, 206 Conn. 1, 2–3, 535 A.2d 1303 (1988) (same). Finally, we note that we do not question that the plaintiff has needs that could be served by the department and that even his 1997 WISC-III test indicates borderline intelligence. The legislature, however, delegated to the defendant a gatekeeping function through his authority to determine eligibility. In close cases like the present one, the defendant and the department's expert staff are better qualified than a court to evaluate conflicting evidence to determine whether that threshold has been met. Accordingly, we conclude that the defendant's decision was supported by substantial evidence in the record.

The judgment is reversed and the case is remanded with direction to dismiss the plaintiff's appeal.

In this opinion the other justices concurred.