******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

BENJAMIN F. ET AL. *v.* DEPARTMENT OF
DEVELOPMENTAL SERVICES ET AL.*
(AC 44025)

Bright, C. J., and Alvord and Pellegrino, Js.

*Syllabus*

The plaintiffs, B and his mother and guardian D, appealed to this court from
the judgment of the trial court dismissing their administrative appeal
from the decision of the defendant Commissioner of Developmental
Services, concluding that B was not eligible for services from the defen-
dant Department of Developmental Services. D filed an application with
the department on B's behalf, seeking services related to B's intellectual
disability and autism spectrum disorder. The department informed D
that B was not eligible for services, and she requested a formal eligibility
hearing. Following the hearing, the department's hearing officer issued
a proposed decision concluding that B was eligible for services. After
reviewing the record, however, the commissioner issued a final decision
determining that, as a result of B's test scores, when viewed in their
totality in accordance with our Supreme Court's decision in *Christopher
R.* v. *Commissioner of Mental Retardation* (277 Conn. 594), B did not
meet the eligibility criteria for an intellectual disability as defined in the
applicable statute (§ 1-1g). The plaintiffs appealed from the commission-
er's decision to the Superior Court, which concluded that there was
substantial evidence in the record supporting the commissioner's final
decision, and the plaintiffs appealed to this court. *Held*:

1. The plaintiffs could not prevail on their claim that an amendment to § 1-
1g in 2012 (Public Acts 2012, No. 12-136), which, inter alia, replaced the
term "one or more" with the word "tests" with respect to the manner
in which the existence of an intellectual disability was to be determined,
precluded the department from considering more than one intelligence
test in its eligibility determinations when the applicant presents one
full-scale IQ test score below 70: following the statutory amendment,
*Christopher R.* remained good law and continued to control the meaning
of § 1-1g, as, in that decision, our Supreme Court did not rely solely on
the legislature's use of the term "one or more" but also relied on common
sense and logic to determine that multiple tests could be considered;
moreover, this court did not read the substitution of the word "tests"
for the term "one or more" to evidence an intention to eliminate the
plural nature of the phrase, and the plain meaning of the term "tests"
refers to more than one test.

2. The plaintiffs' claim that, if the commissioner were permitted to consider
multiple IQ test scores, he was required to analyze all full-scale IQ scores
and that he failed to consider B's 2016 score in violation of § 1-1g was
unpersuasive: although the commissioner deleted the finding pertaining
to B's 2016 full-scale IQ score from his final decision, he added detailed
findings regarding the report that contained the 2016 score and those
findings were supported by substantial evidence in the record.

3. The Superior Court properly declined to take judicial notice of certain
documents relating to B's guardianship hearing in the Probate Court,
including an assessment by two members of the department, which
indicated that B was a person with an intellectual disability as defined
in § 1-1g: the plaintiffs failed to file an application for leave to present
additional evidence with the Superior Court to introduce the Probate
Court documents, despite there being a deadline explicitly provided in
the scheduling order for such a filing; moreover, if the Superior Court
had taken judicial notice of the Probate Court documents, it would have
weighed the evidence in violation of the applicable statute (§ 4-183 (j)),
which prohibits the court from substituting its judgment for that of the
department.

4. The Superior Court properly declined to invoke the doctrine of judicial
estoppel: the plaintiffs' claim that the defendants were estopped from
taking the position that B did not have an intellectual disability as defined
in § 1-1g was premised on representations made by the department to
the Probate Court, the Probate Court documents containing the repre-

sentations were not part of the administrative record, and the Superior Court properly declined the plaintiffs' request to take judicial notice of such documents.

5. The commissioner's decision denying the plaintiffs' application was supported by substantial evidence in the record taken as a whole: the commissioner's reliance on B's test scores from 2010 and 2013 was not arbitrary or capricious because his decision explicitly stated that the department had reviewed all of B's testing, which also included his 2016 and 2018 scores; moreover, the plaintiffs' argument that the Superior Court should have remanded the case due to the commissioner's invalid and insufficient factual findings was unavailing, as this court could not conclude that the commissioner's misstatement relating to the department's 2011 denial of B's prior application for benefits prejudiced the plaintiffs, the commissioner's decision directly referenced the report containing the results of B's cognitive assessment in addition to the allegedly subjective testimony of a department official regarding such results, the commissioner's consideration of subtests, in addition to B's full-scale IQ scores, was supported by substantial evidence and did not run afoul of *Christopher R.*, the commissioner's identification of a statement in the cognitive assessment as being "significant" was not improper, and this court could not substitute its own judgment on the weight of the evidence for that of the commissioner.

Argued May 25—officially released November 2, 2021

*Procedural History*

Appeal from the decision of the defendant Commissioner of Developmental Services denying the application for services submitted on behalf of the named plaintiff, brought to the Superior Court in the judicial district of New Britain, where the court, *Hon. Henry S. Cohn*, judge trial referee, rendered judgment dismissing the appeal, from which the plaintiffs appealed to this court. *Affirmed.*

*Benjamin M. Wattenmaker*, with whom, on the brief, was *John M. Wolfson*, for the appellants (plaintiffs).

*Emily V. Melendez*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Clare Kindall*, solicitor general, for the appellees (defendants).

*Opinion*

ALVORD, J. The plaintiffs, Benjamin F. and his mother and guardian Denise F., appeal from the judgment of the Superior Court dismissing their administrative appeal from the decision of the defendant Commissioner (commissioner) of Developmental Services, concluding that Benjamin is not eligible for services from the defendant Department of Developmental Services (department). On appeal, the plaintiffs claim that (1) the final decision of the commissioner violates the plain language of General Statutes § 1-1g, on the basis that the amended version of the statute no longer permits the commissioner to consider more than one intelligence test where the applicant has presented a full-scale intelligence quotient (IQ) score below seventy, (2) alternatively, that if the statute permits consideration of more than one test, the commissioner is required to consider all full-scale IQ scores, (3) the Superior Court erred in refusing to take judicial notice of certain Probate Court records, (4) the Superior Court erred in declining to apply the doctrine of judicial estoppel, and (5) the final decision was not supported by substantial evidence in the record. We affirm the judgment of the court.

The record reveals the following facts and procedural history. On February 1, 2018, Denise filed an application on behalf of Benjamin, seeking services related to his intellectual disability and autism spectrum disorder. By letter dated April 5, 2018, the department communicated to Denise that Benjamin was not eligible for department services. Denise thereafter requested a formal eligibility hearing, which was held in October, 2018.

On October 29, 2018, the department's hearing officer issued a proposed decision (proposed decision) concluding that Benjamin was eligible for services. The hearing officer made the following findings of fact. Denise had filed two previous applications for department benefits on behalf of Benjamin, which had been denied in 2011 and 2015. In 2016, a cognitive assessment was completed by Chris Abildgaard, a psychologist with Benhaven Learning Network (Abildgaard report). "[Benjamin's] full-scale IQ score was 65 on the [Wechsler Adult Intelligence Scale—Fourth Edition (WAIS-IV)], his [Verbal Comprehension Index (VCI)] score was 74 (which falls in the borderline range), his [Perceptual Reasoning Index (PRI)] score was 73 (which falls in the borderline range), his [Working Memory Index (WMI)] score was 74 (which falls in the borderline range), and his [Processing Speed Index (PSI)] score was 59 (which fell in the extremely low range and is effected by his seizure disorder)." On July 3, 2018, an evaluation of cognitive functioning was completed by Andrew R. Moyer, a school psychologist and behavior analyst (Moyer report). "His [Woodcock-Johnson Test of Cognitive Abilities—Fourth Edition] was 66, which is in the

very low range." "On May 28, 2018, a transition planning evaluation was completed by Margaret Kardos, PhD of Kardos Educational Consulting, LLC [(Kardos report)]. . . . On the Adaptive Behavior Assessment System—3rd Edition (ABAS-3) his skills fall in the extremely low range. Areas of significant weakness were noted in all domains across all settings." "On February 20, 2018, an Autism Spectrum Assessment Program Evaluation report was prepared by Kerri Byron, CCC-SLP of Connecticut Children's Medical Center. His diagnoses were epilepsy, learning disability and autism. . . . On October 4, 2018, a letter was prepared by Mark Schomer, M.D., Pediatric Epilepsy and Neurology of Connecticut Children's Specialty Group, Department of Neurology, recommending that [Benjamin] receive full disability benefits [(Schomer letter)]. . . . On October 30, 2008, an educational evaluation was prepared by Cheryl Carroll, special education teacher at Salem Board of Education, Department of Special Education. . . . In October of 2008, a psychological evaluation was prepared by Donna Zuber, school psychologist at Salem Public Schools. . . . His overall memory ability is in the very deficient range. . . . On April 16, 2008, a pediatric neuropsychology consultation was prepared by Marisa Spann, PhD, clinical neuropsychologist at Yale University School of Medicine. . . . His full-scale IQ was 52." (Citations omitted.)

In the discussion of his findings, the hearing officer noted that Benjamin suffers from a variety of medical conditions, including "autism, attention deficit/hyperactivity disorder, and a significant seizure disorder," which "make it very difficult for the department to determine whether [he] should receive [department] services." The hearing officer explained that the department had found in 2011, 2015, and 2018, that he did not qualify for services primarily on the basis of a disparity in scores on his intelligence tests during the developmental period.[1] The department's psychologists concluded that his other medical conditions were interfering with his cognitive functioning and caused the variations in his test scores. The hearing officer then stated that "one could reasonably conclude that [Benjamin] at the end of the developmental period has an IQ that does qualify him for [department] services." The hearing officer explained: "The psychological report prepared by Dr. Chris Abildgaard . . . is a comprehensive and thorough report that finds that [Benjamin's] IQ is 65, which puts him below the level needed to qualify for [department] services. . . . The report was prepared on July 14 and 16 in 2016, when [he] was seventeen years, eleven months old and at the end of the developmental period. The examiner in the report states that, 'there is about a 90 percent chance that his true score is between 62 [and] 69 on any given day.' He classified his overall performance in the extremely low range, which is equal to 1 percent of people his

age." (Citation omitted.)

The hearing officer further explained: "The [Abildgaard] report also summarizes [Benjamin's] performance on the Vineland Adaptive Behavior Scales . . . [which is a standardized interview that] was completed by his mother, and his scores were as follows: Communication 64, Daily Living 66, Socialization 65 and a Composite score of 67, which [Abildgaard] found to be consistent with his current cognitive potential. These scores would qualify [Benjamin] for [department] services. A more recent analysis of [Benjamin's] adaptive skills was done on May 8, 2018, by Dr. Margaret Kardos, when [he] was age twenty and outside of the developmental period. Even though outside of the developmental period, this report demonstrates that his adaptive skills have remained consistent from the evaluation done in 2016, which was at the end of the developmental period. The summary in the report finds that [Benjamin's] adaptive skills fall in the extremely low range as reported by both his mother and his teacher. In this report, we have the benefit of his teacher's analysis, which, although [it reflected numbers that were] higher than the scores [recorded] by his mother . . . still indicated that [Benjamin] was in the extremely low range. . . .

"The most recent intellectual evaluation of [Benjamin] by Apex Educational Solutions was done on July 3, 2018, when [he] was twenty years, four months [old] and outside of the developmental period [(Apex report)]. The report finds that [Benjamin's] General Intellectual Ability was 66 in the very low range. The examiner noted that [Benjamin] worked very hard and exerted himself on all aspects of the test, but his overall level of intellectual functioning fell in the very low range, which is consistent with the [Abildgaard report prepared] when [he] was at the end of the developmental period." The hearing officer determined that the two most recent reports supported the findings in the two reports performed at the end of the developmental period that Benjamin's IQ and his adaptive skills met the requirements of § 1-1g and entitled him to department services.

After reviewing the record, on January 28, 2019, the commissioner issued a final decision (final decision) notifying Denise that he did not concur with the hearing officer's determination that Benjamin is eligible for department services. In his final decision, the commissioner deleted several of the hearing officer's findings of fact and added other findings of fact. Specifically, the commissioner deleted the findings of fact regarding the Abildgaard, Moyer, and Kardos reports, and the Schomer letter. The commissioner added the following findings of fact: "In the cognitive assessment that Dr. Chris Abildgaard completed towards the end of the developmental period when [Benjamin] was seventeen

years, eleven months [old], the doctor found that [his] '[full-scale IQ] falls within the borderline range and is consistent with his current adaptive functioning.' . . . Significantly, in the assessment, Dr. Abildgaard advised: 'For a more complete developmental history, the reader is encouraged to reference the psychoeducational evaluation conducted by Dr. Erik Mayville in 2013.' . . . The assessment noted that all but one of the WAIS-IV index scores, the [PSI], fell in the borderline range and that '[d]ifficulties in scanning large amounts of visual stimuli and visual motor coordination may have impacted . . . [the PSI] results.' . . . The assessment indicated, 'By parent report in the last six months, [Benjamin] has experienced twenty-six seizures. Several required immediate medical support.' . . . Dr. Abildgaard recommended that [Benjamin] 'benefits from longer amounts of processing time . . . when presented with tasks or directives . . . [he] also benefits from being allowed to get verbal information out at a slower pace . . . [and] often knows what he wants to say, however it will take him slightly longer to get all those thoughts out.' . . . He also recommended that [Benjamin's] 'program at the Benhaven Academy is appropriate at this time and day-to-day programming *should not change based on these results.*' . . . Accordingly, [Benjamin's] primary disability of autism and his programming subsequently did not change. . . .

"In 2011, [Benjamin] was denied eligibility for [department] services because, on a May, 2010 [Weschler Intelligence Scale for Children—Fourth Edition (WISC-IV) test], he obtained a full-scale IQ of 87 and he was functioning in the average range of intelligence. Moreover, there was 'cognitive testing indicating he [was] functioning within at least the high borderline to average range of measured intelligence.' . . . In 2015, [Benjamin] was denied eligibility for [department] services because '[his] intellectual functioning [was] in the average range, which is significantly above the intellectual disabled range.' On a 2013 psychological evaluation, upon administration of the Stanford Binet [Intelligence Scales]-V, he 'earned a full-scale IQ score of 90.' On a 2013 Wechsler Individual Achievement Test-III (WIAT-III), 'his Total Reading Composite Standard Score was 91, Reading Comprehension and Fluency Composite was 84, Mathematics Composite was 81, and Written Expression Composite was 91. Of the twenty-six subtest scores generated by the WIAT-III, twelve were in the average range, eleven were in the low average range, and three were in the borderline range." (Citations omitted; emphasis in original.)

The commissioner replaced the discussion section of the proposed decision with a summary of our Supreme Court's decision in *Christopher R.* v. *Commissioner of Mental Retardation*, 277 Conn. 594, 893 A.2d 431 (2006). Ultimately, the commissioner concluded: "The record in the present case simply does not meet the burden

of . . . § 1-1g. Pursuant to [*Christopher R.*], the expert staff for [the department] has the authority as granted by the state legislature to determine whether [Benjamin's] scores during the developmental period, and the testing conducted after, when viewed in their totality meet the eligibility criteria for an intellectual disability. [The department] has reviewed all testing and determined that the test scores do not meet the requisite criteria. Accordingly, [Benjamin] is not eligible for [department] services based upon an intellectual disability, as he does not meet the criteria for services as defined in . . . § 1-1g."

Pursuant to General Statutes § 4-183, the plaintiffs appealed from the commissioner's decision to the Superior Court. The plaintiffs' appeal raised four issues: whether (1) the department failed to apply § 1-1g as amended in 2012, (2) the department failed to consider Benjamin's 2016 full-scale IQ score, (3) the department's denial of benefits was not supported by substantial evidence, and (4) the department was estopped from concluding that Benjamin is ineligible for services on the basis of statements made by department representatives in a 2016 Probate Court proceeding. Following briefing and oral argument, the Superior Court, *Hon. Henry S. Cohn*, judge trial referee, dismissed the appeal in a February 24, 2020 memorandum of decision. The court rejected the plaintiffs' arguments and concluded that there was substantial evidence in the record supporting the final decision of the commissioner. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The plaintiffs' first claim on appeal is that the final decision violates § 1-1g. Specifically, the plaintiffs contend that under the plain language of § 1-1g as amended, the department "no longer has the discretion to consider more than one intelligence test where, as here, the applicant presents one full-scale IQ score below 70." We disagree.

We first set forth our standard of review. Although § 1-1g was subjected to prior judicial scrutiny in *Christopher R.*, the present case requires us to determine the effect of subsequent legislative action on our Supreme Court's holding in that case. "[W]e do not defer to the [agency's] construction of a statute—a question of law—when . . . the [provisions] at issue previously have not been subjected to judicial scrutiny or when the [agency's] interpretation has not been time tested." (Internal quotation marks omitted.) *Brennan* v. *Waterbury*, 331 Conn. 672, 683, 207 A.3d 1 (2019). "In such a case, our review of those provisions is plenary." *Christopher R.* v. *Commissioner of Mental Retardation*, supra, 277 Conn. 604. We therefore apply plenary review and established rules of construction.

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and [common-law] principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Meriden* v. *Freedom of Information Commission*, 338 Conn. 310, 320–21, 258 A.3d 1 (2021).

We next set forth the statutory and regulatory scheme. General Statutes § 17a-212 directs the commissioner of the department to "adopt regulations . . . establishing . . . criteria for . . . determining eligibility for services provided by the department . . . ." The commissioner promulgated a regulation stating in relevant part that "[a] person is eligible for services of the department if he: (1) is a resident of the State of Connecticut; and (2) has mental retardation. . . ." Regs., Conn. State Agencies § 17a-212-2 (b). The regulation uses the same definition of "mental retardation" as provided in General Statutes (Supp. 2012) § 1-1g. Regs., Conn. State Agencies § 17a-212-1 (10).

Section 1-1g (a) defines " 'intellectual disability' "[2] as "a significant limitation in intellectual functioning existing concurrently with deficits in adaptive behavior that originated during the developmental period before eighteen years of age." That section further defines " 'significant limitation in intellectual functioning' " as "an intelligence quotient more than two standard deviations below the mean as measured by *tests* of general intellectual functioning that are individualized, standardized and clinically and culturally appropriate to the individual . . . ." (Emphasis added.) General Statutes § 1-1g (b). The statutory phrase " 'an [IQ] more than two standard deviations below the mean' " refers to an IQ below seventy. *Christopher R.* v. *Commissioner of Mental Retardation*, supra, 277 Conn. 597–98.

Prior to October 1, 2012, General Statutes (Supp. 2012) § 1-1g defined " 'mental retardation' " as "a significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior

and manifested during the developmental period." It further defined " 'general intellectual functioning' " as "the results obtained by assessment with *one or more* of the individually administered general intelligence tests developed for that purpose and standardized on a significantly adequate population and administered by a person or persons formally trained in test administration . . . ." (Emphasis added.) General Statutes (Supp. 2012) § 1-1g (c).

We next turn to a discussion of our Supreme Court's decision in *Christopher R.* v. *Commissioner of Mental Retardation*, supra, 277 Conn. 596–97, which addressed the 2003 revision of § 1-1g. See id., 596 n.2. In that case, the department initially determined that the plaintiff was ineligible for services on the basis of a disparity between the plaintiff's verbal and performance scores on the 2002 Weschler Intelligence Scale for Children—Third Edition (WISC-III) test and on previous tests on which the plaintiff scored within a normal or average range. Id. On appeal, our Supreme Court first considered the question of whether the commissioner "may consider more than one general intelligence test to determine whether an applicant is mentally retarded and, therefore, is eligible for the department's services." Id., 606. The court analyzed General Statutes (Rev. to 2003) § 1-1g, which used the term "mental retardation"; see footnote 2 of this opinion; and found persuasive that the statute referred to "the results obtained by assessment with *one or more of the individually administered general intelligence tests* developed for that purpose . . . ." (Emphasis in original; internal quotation marks omitted.) *Christopher R.* v. *Commissioner of Mental Retardation*, supra, 607–608. The court reasoned: "By construing the phrase 'one or more' to mean that *more than one* general intelligence test should be considered, if available, we give effect to each word in the statute. By contrast, in order to adopt a construction under which an applicant must be deemed mentally retarded upon submitting one test with a full scale score below seventy, irrespective of other test scores—we would have to read [the] words 'or more' out of the statute. Indeed, we essentially would have to read the phrase as if it stated 'at least one' general intelligence test, instead of 'one or more' intelligence tests. This court, however, will not substitute language for that chosen by the legislature. . . .

"Moreover, '[i]n construing a statute, common sense must be used and courts must assume that a reasonable and rational result was intended.' . . . Consider, therefore, a hypothetical situation in which an applicant has taken four general intelligence tests over a period of several years, with the three most recent tests reflecting full scale scores of ninety, and the earliest test reflecting a full scale score of sixty-nine. It would be illogical to require that the department deem an applicant eligible for services, as the plaintiff contends,

simply because of one anomalous test score." (Citations omitted; emphasis in original; footnote omitted.) Id., 608–609.

The court next turned to the question of whether the commissioner exceeded his authority when, in light of conflicting test results, he considered evidence other than general intelligence test full-scale scores. Id., 611. The court stated: "Faced with such conflicting scores, the defendant necessarily was required to make a determination as to whether the plaintiff's general intellectual functioning was in fact significantly subaverage. Nothing in the statutes or regulations limits the defendant's discretion in this regard, and the defendant is especially qualified to make such a determination. . . . Indeed, we generally defer to an agency with expertise in matters requiring such a technical, case-by-case determination." (Citations omitted.) Id.

Noting that "such a factual determination must be sustained if it is reasonably supported by substantial evidence in the record taken as a whole"; id.; the court considered the conclusions of Virginia Wohlstrom, the school psychologist who administered the 2002 WISC-III test and determined that the plaintiff had the ability to function at a general intellectual level that was higher than his full-scale score of sixty-six on that test. Id., 612–13. Wohlstrom highlighted several issues regarding the test results. Id. Specifically, Wohlstrom concluded "that the plaintiff's low performance score was reflective more of the fact that it took the plaintiff an excessive amount of time to complete his work, than that he actually was performing in the intellectually deficient range. She also noted that the plaintiff's verbal score was skewed downward because of a significantly weak score in a subtest measuring comprehension. Wohlstrom opined that the plaintiff's pervasive developmental disorder affected that score, and concluded that [the plaintiff's] verbal functioning in non-social situations, such as the classroom, is in the [a]verage range. Wohlstrom also noted that the plaintiff was functioning at the upper level of his classes, typically getting B grades." (Internal quotation marks omitted.) Id. The court noted that Wohlstrom's assessment was consistent with previous intelligence tests administered to the plaintiff, on which the plaintiff had scored within the average range. Id., 613.

The court next turned to the commissioner's decision to examine separately the tests' verbal and performance scores, as well as subtests within those scores. Id., 614. Specifically, the department's psychologist, in his initial determination of ineligibility, had referenced, inter alia, the plaintiff's average score on a 1998 Test of Nonverbal Intelligence-2, which the psychologist found significant when coupled with the plaintiff's verbal score of eighty on the 2002 WISC-III test. Id., 613. The court determined that the commissioner's decision to examine the scores

separately was supported by the Diagnostic and Statistical Manual of Mental Disorders, which provided: "When there is significant scatter in the subtest scores, the profile of strengths and weaknesses, rather than the mathematically derived full-scale IQ, will more accurately reflect the person's learning abilities. When there is a marked discrepancy across verbal and performance scores, averaging to obtain a full-scale IQ score can be misleading." (Internal quotation marks omitted.) Id., 614, quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th Ed. 1994) p. 40. The court noted that the clinical neuropsychologist "who had administered the plaintiff's 1997 WISC-III test, found the broad disparity between the plaintiff's verbal and performance scores to be clinically significant." *Christopher R.* v. *Commissioner of Mental Retardation*, supra, 277 Conn. 614.

Moreover, the court explained that the record reflected several psychological, social and medical evaluations performed over the years that had diagnosed the plaintiff as having a learning disability, pervasive developmental disorder, and obsessive compulsive disorder. Id. The psychologist that performed the 2002 assessment and the neuropsychologist who performed the 1997 assessment both opined that certain of the plaintiff's disorders may have impacted his scores. Id. The court concluded that the commissioner properly could have relied on such evidence. Id., 614–15. Lastly, the court stated that the commissioner "was entitled to consider the absence of any reference to mental retardation" in the numerous assessments performed. Id., 615. Ultimately, the court concluded that the commissioner's decision "was supported by substantial evidence in the record." Id., 616.

With that background in mind, we turn to the plaintiffs' claim that, under the amended statute, the department "no longer has the discretion to consider more than one intelligence test where, as here, the applicant presents one full-scale IQ score below 70."

The following additional procedural history is relevant to this claim. The Superior Court addressed the plaintiffs' claim as follows: "The plaintiffs claim that with the amendment of 2012 to § 1-1g, deleting the phrase 'one or more,' the [department] may not review more than one score in determining eligibility. Here there are two test scores that meet the 'one-score' definition. The plaintiffs claim that under [General Statutes § 1-1 (f)], the use of a plural may also mean the singular. On the other hand, as the [department] points out, the amended § 1-1g (b) does retain the word 'tests' in two places. The use of the plural indicates that the legislature did not intend to allow one test to be determinative. According to the [department], [General Statutes] § 1-1a requires the court to give a common meaning to the amended statute. Therefore, *Christopher R.* continues

to be a valid precedent that the [department] was required to rely on." (Footnote omitted.) Although the Superior Court found the statute to be plain and unambiguous, it stated that, even if it used legislative history, "it is clear that the intent of the legislature was to abolish a pejorative definition in § 1-1g (b), and not to alter *Christopher R.*"

On appeal, the plaintiffs first argue that *Christopher R.* is no longer good law in light of the 2012 amendments to § 1-1g. Specifically, they emphasize that the "legislature is always presumed to be aware of all existing statutes and the effect that its action or nonaction will have on any of them . . . and it also is presumed to be aware of existing judicial interpretations of those statutes." (Citation omitted; internal quotation marks omitted.) *AvalonBay Communities, Inc.* v. *Zoning Commission*, 87 Conn. App. 537, 559, 867 A.2d 37 (2005), aff'd, 280 Conn. 405, 908 A.2d 1033 (2006). The plaintiffs maintain that the legislature was "aware of the significance ascribed to the phrase 'one or more' in the text of § 1-1g by the Supreme Court in *Christopher R.*," and the Supreme Court's express reliance on that phrase in stating that, "to adopt a construction under which an applicant must be deemed mentally retarded upon submitting one test with a full scale score below seventy, irrespective of other test scores—we would have to read [the] words 'or more' out of the statute." *Christopher R.* v. *Commissioner of Mental Retardation*, supra, 277 Conn. 608. Thus, according to the plaintiffs, the removal of the words "one or more" must be interpreted to mean that an applicant who presents one test with a full-scale score below seventy must be deemed to have an intellectual disability.

We disagree with the plaintiffs' contention that the 2012 amendments to § 1-1g, which replaced the words "one or more" with the word "tests," renders *Christopher R.* no longer good law. Notably, our Supreme Court did not rely solely on the legislature's use of the term "one or more" but also relied on common sense and logic, considering a hypothetical situation in which three recent tests reflected full-scale scores of ninety and the earliest test reflected a full-scale score of sixty-nine. See *Christopher R.* v. *Commissioner of Mental Retardation*, supra, 277 Conn. 609. The court stated that "[i]t would be illogical to require that the department deem an applicant eligible for services . . . simply because of one anomalous test score." Id. The court also relied on the commissioner's special qualification to make determinations of eligibility, noting that "[n]othing in the statutes or regulations limits the [commissioner's] discretion in this regard . . . ." Id., 611. Moreover, as discussed further subsequently in this opinion, we do not read the substitution of "tests" for "one or more" to evidence an intention to eliminate the plural nature of the phrase. Accordingly, we conclude that *Christopher R.* remains good law and continues

to control the meaning of § 1-1g.

Second, the plaintiffs argue that the Superior Court's "assumption that the legislature's use of a plural noun is significant in statutory interpretation is incorrect," citing § 1-1 (f), which provides: "Words importing the singular number may extend and be applied to several persons or things, and words importing the plural number may include the singular." The plaintiffs further challenge the Superior Court's reference to "tests" as appearing twice in the statute, arguing that the use of the plural is of significance *only* when the legislature uses both the plural and singular terms within the statute. See *Covenant Insurance Co.* v. *Coon*, 220 Conn. 30, 36 n.6, 594 A.2d 977 (1991) ("the fact that the legislature used both plural and singular terms in the statute is a strong indication that the use of the singular was deliberate").[3]

We are not persuaded by the plaintiffs' argument that the use of the plural term "tests" is insignificant. "[A]lthough . . . § 1-1 (f) provides that [w]ords importing the singular number may extend and be applied to several persons or things, and words importing the plural number may include the singular, we have held that because § 1-1 (f) uses the word may it is clearly directory and not mandatory. . . . [S]uch statutory expressions are legislative statements of a general principle of interpretation. . . . The principle does not require that singular and plural word forms have interchangeable effect, and discrete applications are favored except where the contrary intent or reasonable understanding is affirmatively indicated." (Internal quotation marks omitted.) *State* v. *Brown*, 310 Conn. 693, 704, 80 A.3d 878 (2013). There is no such contrary intent or reasonable understanding affirmatively indicated in § 1-1g. Rather, the plain meaning of the word "tests" in its plural form refers to more than one test.[4]

Accordingly, we conclude that the 2012 amendment to § 1-1g does not preclude the commissioner from considering more than one intelligence test.

## II

Having determined that § 1-1g, as amended, continues to permit the commissioner to consider more than one test score, we turn to the plaintiffs' second, and alternative, claim that "the statute requires the defendants to analyze all of the applicant's full-scale IQ scores as part of [their] final decision." Specifically, the plaintiffs claim that the commissioner's failure to consider Benjamin's January, 2016 full-scale IQ score violates § 1-1g. The defendants respond that "[t]he evidence both in the record and the final decision itself shows that [the department] did indeed consider these results but interpreted them differently than the plaintiff." We agree with the defendants.

The following additional procedural history is rele-

vant to this claim. As noted previously, the proposed decision stated, with respect to the Abildgaard report that contained the 2016 score, that Benjamin's "full-scale IQ score was 65 on the WAIS-IV, his VCI score was 74 (which falls in the borderline range), his PRI score was 73 (which falls in the borderline range), his WMI score was 74 (which falls in the borderline range), and his PSI score was 59 (which fell in the extremely low range and is effected by his seizure disorder)."

Although the final decision deleted this paragraph, it added other findings related to the Abildgaard report. Specifically, the commissioner found: "In the cognitive assessment that Dr. Chris Abildgaard completed towards the end of the developmental period when [Benjamin] was seventeen years, eleven months [old], the doctor found that [his] '[full-scale IQ] falls within the borderline range and is consistent with his current adaptive functioning.' . . . Significantly, in the assessment, Dr. Abildgaard advised: 'For a more complete developmental history, the reader is encouraged to reference the psychoeducational evaluation conducted by Dr. Erik Mayville in 2013.' . . . The assessment noted that all but one of the WAIS-IV index scores, the [PSI], fell in the borderline range and that '[d]ifficulties in scanning large amounts of visual stimuli and visual motor coordination may have impacted . . . [the PSI] results.' . . . The assessment indicated, 'By parent report in the last six months, [Benjamin] has experienced twenty-six seizures. Several required immediate medical support.' . . . Dr. Abildgaard recommended that [Benjamin] 'benefits from longer amounts of processing time . . . when presented with tasks or directives . . . [he] also benefits from being allowed to get verbal information out at a slower pace . . . [and] often knows what he wants to say, however it will take him slightly longer to get all those thoughts out.' . . . He also recommended that [Benjamin's] 'program at the Benhaven Academy is appropriate at this time and day-to-day programming *should not change based on these results.*' . . . Accordingly, [Benjamin's] primary disability of autism and his programming subsequently did not change." (Citations omitted; emphasis in original.)

In its memorandum of decision, the Superior Court, applying the substantial evidence test, determined that it "cannot set aside the . . . commissioner's conclusion that Benjamin's test scores from 2016 were not properly evaluated. The commissioner concluded that Dr. Abildgaard's report showed that Benjamin's scores were in the borderline range, except for processing speed. The commissioner used properly the full IQ score, but took into account subtests."

We first set forth our standard of review of this claim. The plaintiffs claim that their contention that the statute requires the department to consider all scores is subject

to plenary review. The plaintiffs' statutory interpretation claim, which would compel plenary review, is only relevant, however, to the extent that the commissioner failed to consider the 2016 score, which the defendants dispute. We first address that threshold question, which, as the defendants suggest, is subject to review for substantial evidence. See *Costello* v. *Commissioner of Developmental Services*, 128 Conn. App. 286, 290, 16 A.3d 811 (2011) (claim that commissioner ignored substantial evidence in record was subject to review for substantial evidence in record to support agency's factual findings).

"According to our well established standards, [r]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . [A]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts." (Internal quotation marks omitted.) Id.

We disagree with the plaintiffs' argument that the commissioner failed to consider Benjamin's full-scale IQ score as reported in the Abildgaard report. Although the commissioner deleted the finding pertaining to the full-scale score from his final decision, he did so in conjunction with his addition of detailed findings regarding that assessment, which findings were supported by substantial evidence in the record. Specifically, the commissioner considered that Abildgaard's report indicated that Benjamin's full-scale IQ score fell " 'within the borderline range and [was] consistent with his current adaptive functioning.' " The commissioner noted that all but one of the WAIS-IV index scores—the PSI—fell within the borderline range. The commissioner further noted that Abildgaard stated in his report that " '[d]ifficulties in scanning large amounts of visual stimuli and visual motor coordination may have impacted' " the PSI results. Lastly, the commissioner referenced Abildgaard's notation that Benjamin's mother had reported that he had experienced twenty-six seizures in the preceding six months. The separate examination of the subtest scores and consideration of other factors impacting such scores is within the authority of the commissioner.[5] See *Christopher R.* v. *Commissioner of Mental Retardation*, supra, 277 Conn. 614–15. Accordingly, we reject the plaintiffs' argument that the commissioner failed to consider the 2016 full-scale IQ score.

## III

The plaintiffs' third claim on appeal is that the Superior Court erred in refusing to take judicial notice of certain Probate Court documents "for the purpose of establishing that [the department] took the position in the Probate Court that Benjamin has an intellectual disability pursuant to § 1-1g, and the Probate Court adopted [the department's] position." We disagree.

The following additional procedural history is relevant. In their administrative appeal to the Superior Court, the plaintiffs represented that Denise had been appointed plenary guardian of Benjamin, following a guardianship hearing in the Probate Court. The plaintiffs attached to their administrative appeal the Probate Court order. The plaintiffs also alleged in their appeal that, prior to the Probate Court hearing, two assessment team members from the department had filed with the Probate Court an evaluation in which they represented that Benjamin is " 'a person with intellectual disability as defined in . . . § 1-1g.' " The plaintiffs attached to their administrative appeal a copy of the evaluation. The plaintiffs alleged that the Probate Court's order found that Benjamin " 'is by reason of the severity of his intellectual disability, totally unable to meet essential requirements for his physical health or safety, and totally unable to make informed decisions about matters related to his care.' " On the basis of the representations of the assessment team members made to the Probate Court, the plaintiffs alleged in their administrative appeal that the department was barred by the doctrine of judicial estoppel from representing to the Superior Court that Benjamin did not have an intellectual disability pursuant to § 1-1g.

The Superior Court's scheduling order included a date by which the plaintiffs could file a motion to present additional evidence to supplement the record pursuant to § 4-183 (h). The plaintiffs did not file any such motion. In their brief to the Superior Court, the plaintiffs again referenced and attached as exhibits the Probate Court order and evaluation (Probate Court documents) in support of their claim of judicial estoppel and maintained that the court could take judicial notice of such records. The parties thereafter filed additional briefing on the issue and discussed it at oral argument.

In its memorandum of decision, the Superior Court explained that Denise did not introduce into the administrative record the Probate Court documents and noted that she was self-represented at the hearing before the hearing officer and during the commissioner's review of the proposed decision. The court explained that the plaintiffs, who had retained counsel to represent them in their administrative appeal, now requested that the court take judicial notice of the Probate Court documents in support of their claim of judicial estoppel. The

court rejected their request. First, the court stated that judicial notice to supplement a record in an administrative appeal was rejected in *Blinkoff* v. *Commission on Human Rights & Opportunities*, 129 Conn. App. 714, 722, 20 A.3d 1272, cert. denied, 302 Conn. 922, 28 A.3d 341 (2011). The court found significant that the plaintiffs chose to rely only on the doctrine of judicial notice rather than filing a motion to supplement the record pursuant to § 4-183 (h).

The court then stated that, "even if [it] were to take judicial notice of the [department's] declarations in the Probate Court, the court would have to weigh these averments against the findings in the final decision." The court noted that, pursuant to § 4-183 (j), it is prohibited from substituting its judgment for that of the agency as to the weight of the evidence on questions of fact. The court next determined that the Probate Court documents were not conclusive. Having reviewed the two documents, the court stated that, although "the Probate Court believed Benjamin was in need of a guardian, because of his developmental challenges, it did not state that he was . . . eligible [for the department's services]." The court noted that "a panel of the [department] found Benjamin to qualify for § 1-1g services, but not on the basis of psychological tests."

On appeal, the plaintiffs reiterate their argument that the Superior Court was permitted to take judicial notice of the Probate Court documents and that it erred in refusing to do so.

We first set forth our standard of review. Whether the court properly applied § 4-183 (h) and (j) in denying the plaintiffs' request that it take judicial notice of certain documents presents a question of law subject to plenary review. See *Estela* v. *Bristol Hospital, Inc.*, 179 Conn. App. 196, 207, 180 A.3d 595 (2018).

We begin our analysis with *Blinkoff* v. *Commission on Human Rights & Opportunities*, supra, 129 Conn. App. 715, in which the plaintiff appealed from the judgment of the trial court dismissing her administrative appeal from the decision of the Commission on Human Rights and Opportunities. She argued, inter alia, that the Superior Court improperly had failed to consider certain statements and documents in its review. Id. That is, the plaintiff had filed with the Superior Court several "motion[s] to take judicial notice of public documents," attaching exhibits that were not in evidence at the agency hearing. (Internal quotation marks omitted.) Id., 722. The Superior Court denied the motions, stating that its review of the referee's decision was limited to the administrative record. Id. On appeal to this court, the plaintiff argued that the Superior Court should have considered the documents under the doctrines of judicial admissions and judicial estoppel. Id., 723. This court concluded that the Superior Court "properly did not consider the newly offered statements and docu-

ments." Id.

In *Blinkoff*, this court supported its decision by citing § 4-183 (i); id.; which provides in relevant part that the administrative appeal "shall be confined to the record. . . ." General Statutes § 4-183 (i). Our statutes, however, do provide a procedure by which a party to an administrative appeal may file a motion with the Superior Court seeking a remand to the agency to present additional evidence. Section 4-183 (h) provides: "If, before the date set for hearing on the merits of an appeal, application is made to the court for leave to present additional evidence, and it is shown to the satisfaction of the court that the additional evidence is material and that there were good reasons for failure to present it in the proceeding before the agency, the court may order that the additional evidence be taken before the agency upon conditions determined by the court. The agency may modify its findings and decision by reason of the additional evidence and shall file that evidence and any modifications, new findings, or decisions with the reviewing court."

Pursuant to § 4-183 (h), "a trial court has discretion regarding whether to grant or deny a motion brought pursuant to the statute." *Salmon* v. *Dept. of Public Health & Addiction Services*, 259 Conn. 288, 315, 788 A.2d 1199 (2002). In order for a party to obtain a remand to the agency for the taking of additional evidence, the party must demonstrate that "(1) the proffered evidence was material; and (2) there were good reasons for [the] failure to present it at the [agency] hearing." Id., 315–16. "[A] court order granting such [an application] does not vitiate the department's original decision, but instead permits [it] to consider new evidence and to modify its decision as necessary. Thus, a remand under § 4-183 (h) does not offer the parties an opportunity to relitigate the case ab initio, but rather represents a continuation of the original agency proceeding." (Internal quotation marks omitted.) *Clark* v. *Commissioner of Motor Vehicles*, 183 Conn. App. 426, 442, 193 A.3d 79 (2018).

Under the separate doctrine of judicial notice, "[c]ourt records may be judicially noticed for their existence, content and legal effect. . . . Care should be taken [however] to avoid noticing judicial records in one case as evidence upon which to find facts in another case. For example, one can judicially notice that certain testimony was given in a case, but not that it was true." (Internal quotation marks omitted.) *O'Connor* v. *Larocque*, 302 Conn. 562, 568 n.6, 31 A.3d 1 (2011). The plaintiffs maintain that "[t]he doctrine of judicial notice also applies to administrative agencies." *West Hartford* v. *Freedom of Information Commission*, 218 Conn. 256, 264, 588 A.2d 1368 (1991); id. (*agency* reasonably could have taken judicial notice of fact that addresses are available in public directories). Specifically, the plaintiffs rely on General Statutes § 4-178, which governs evidence in

contested cases in agency proceedings and provides in relevant part that "notice may be taken of judicially cognizable facts . . . ."[6] It is the agency though that can take judicial notice as part of its fact-finding process, not the Superior Court, which is reviewing the decision of the agency on the basis of the record before it. Consequently, § 4-178 is inapplicable in the present case because the plaintiffs did not request *the agency*, the department in this case, to take judicial notice of the Probate Court documents.

Significantly, the plaintiffs failed to file with the Superior Court an application for leave to present additional evidence, despite there being a deadline explicitly provided in the scheduling order for such motions. Had they done so, and had they met the statutory requirements, the Superior Court would have considered the request and could have ordered that the Probate Court documents be taken before the department, which would then have the opportunity to modify its findings and decision by reason of that evidence. Rather than avail themselves of the statutory procedure, the plaintiffs' counsel expressed his opinion, during oral argument before the Superior Court, that "judicial notice is an option to get this done . . . quick." Indeed, the plaintiffs' counsel requested that the trial court *itself* consider such documents pursuant to the doctrine of judicial notice, rather than utilize the statutory process available for remand to the *department* to consider the evidence in the first place.

As noted previously, the plaintiffs sought to introduce the Probate Court documents in order to assert a claim of judicial estoppel. The Superior Court concluded, and we agree, that even if it had taken judicial notice of the documents, it would have resulted in the Superior Court weighing the evidence, which is inappropriate in light of its restrictive standard of review. See General Statutes § 4-183 (j) ("[t]he court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact"). On the basis of the plaintiffs' failure to take advantage of the statutory process by which they could seek to have additional evidence taken before the agency, and the violation of § 4-183 that would have necessarily resulted from the Superior Court taking judicial notice of the Probate Court documents, we conclude that the court properly declined to take judicial notice of the documents.

IV

The plaintiffs' next claim on appeal is that the Superior Court erred in refusing to apply the doctrine of judicial estoppel.[7] Specifically, the plaintiffs claim that the defendants are estopped from taking the position that Benjamin does not have an intellectual disability as defined by § 1-1g on the basis of earlier representations, made by representatives of the department to the Probate Court that Benjamin is " 'a person with intellectual

disability as defined in . . . § 1-1g.' '' The plaintiffs' judicial estoppel argument is premised on representations made in the Probate Court documents that were not part of the administrative record. Because, as we concluded in part III of this opinion, the Superior Court properly denied the plaintiffs' request to take judicial notice of the Probate Court documents, the court properly declined to invoke the doctrine of judicial estoppel on the basis of the representations made therein.

V

The plaintiffs' final claim on appeal is that the Superior Court "erred in ruling that the final decision is supported by substantial record evidence." The plaintiffs initially argue that the commissioner's reliance on intelligence test scores from 2010 and 2013, rather than the 2016 Abildgaard report and the 2018 Apex report, was arbitrary and capricious. Next, the plaintiffs argue that the final decision "made several invalid and insufficient findings, and therefore, the [Superior Court] erred in failing to remand the case for further proceedings." We conclude that the decision denying the plaintiffs' application was supported by substantial evidence.

As previously stated in part II of this opinion, addressing the plaintiffs' related claim, "[r]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable." (Internal quotation marks omitted.) *Costello* v. *Commissioner of Developmental Services*, supra, 128 Conn. App. 290. "This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . The reviewing court must take into account [that there is] contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence . . . ." (Internal quotation marks omitted.) *Christopher R.* v. *Commissioner of Mental Retardation*, supra, 277 Conn. 611–12.

We first address the plaintiffs' challenge to the commissioner's reliance on earlier intelligence test scores rather than more recent test scores. The plaintiffs' point to Benjamin's full-scale scores on his two most recent evaluations in 2016 and 2018, which were 65 and 66, respectively, as demonstrating "the absence of substantial evidence to support the defendants' final decision to deny services to Benjamin." We already have discussed the commissioner's use of the 2016 score in this opinion; see part II of this opinion; and we focus on the 2018 score here.

We disagree with the plaintiffs' contention that the final decision fails to acknowledge the 2018 score. The hearing officer's proposed findings stated that the Apex report was prepared in 2018, when Benjamin was twenty years and four months old. Thus, the report was prepared outside of the developmental period. See General Statutes § 1-1g (a) (defining " 'intellectual disability' " as "a significant limitation in intellectual functioning existing concurrently with deficits in adaptive behavior that originated during the developmental period *before eighteen years of age*" (emphasis added)). Although the final decision deleted the hearing officer's proposed finding related to the Apex report, the commissioner in his final decision stated that the department has the authority "to determine whether [Benjamin's] scores during the developmental period, *and the testing conducted after*," meet the eligibility criteria. (Emphasis added.) Immediately following this statement, the commissioner reported that the department had reviewed "*all testing* and determined that the test scores do not meet the requisite criteria." (Emphasis added.) Accordingly, we are not persuaded that the commissioner failed to acknowledge the 2018 test.

With respect to the plaintiffs' challenges to the factual findings as invalid and insufficient, we first examine the commissioner's finding related to the 2010 WISC-IV test results. The finding at issue states: "In 2011, [Benjamin] was denied eligibility for [department] services because, on a May, 2010 WISC-IV [test], he obtained a full-scale IQ of 87 and he was functioning in the average range of intelligence. Moreover, there was 'cognitive testing indicating he [was] functioning within at least the high borderline to average range of measured intelligence.' " The plaintiffs reference a March 30, 2011 letter, authored by H. Steven Zuckerman, a department psychologist, which was entered into evidence before the agency proceedings and which states that the full-scale IQ score from the May, 2010 WISC-IV test "is not interpretable." Specifically, the letter provided: "According to the [b]ook, Essentials of the WISC-IV Assessment by Alan S. Kaufman and Dawn P. Flanagan published in 2004, and [t]echnical [n]otes from the [p]ublishers, you cannot [utilize] or interpret a [full-scale] IQ if the difference between any [two] of the indexes are greater than 23 points (i.e., 1 1/2 Standard Deviations). As one can see from the above Standard Scores, this is the case in more than one of the Standard Scores. The [PSI] is 44 points below the [PRI], and the [WMI] is 24 points below the [PRI]. Thus the [full-scale] IQ is not interpretable.

"One therefore must examine all the indexes separately, and if possible, one compute[s] a General Ability Index (GAI) Standard [Score]. The GAI serves as a measure of the individual['s] true cognitive abilities. The examiner did not compute the GAI, however the

[d]epartment did, and it was 99. A GAI Standard Score of 99, attained during the developmental period, is 30 IQ points above what is considered to be the mentally retarded range of measured intelligence (i.e., a score of 69 or below), and is within the [a]verage [r]ange of [m]easured [i]ntelligence. Therefore, as there are not concurrent deficits in both adaptive and cognitive abilities, as . . . § 1-1g requires, this individual is not eligible for the services of the [d]epartment."[8]

We agree with the plaintiffs that the commissioner's finding misstates the basis for the 2011 denial of eligibility. The defendants argue that the misstatement does not require a remand because, as Zuckerman explained later in the letter, there was an alternate method of scoring the test by calculating a GAI. As the defendants recognize, however, there is no indication from the final decision that the commissioner relied on the alternate method of scoring. To the contrary, the commissioner specifically cited the full-scale score of 87.

Pursuant to § 4-183 (j), "[t]he court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings . . . are . . . clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record . . . ." We cannot conclude that the commissioner's misstatement of the basis for the 2011 denial of eligibility has prejudiced the plaintiffs. Although the commissioner indicated that Benjamin was denied eligibility in 2011, on the basis of the 2010 test results, the commissioner's other findings addressed Benjamin's 2015 denial of eligibility and, more comprehensively, the 2016 Abildgaard report. See part II of this opinion. Thus, the commissioner's determination of ineligibility remains supported by substantial evidence in the record, even excluding the 2010 results from consideration.

Second, the plaintiffs argue that the commissioner improperly relied on the testimony of Kathleen Murphy, the director of eligibility for the department, as to her subjective opinion regarding Abildgaard's finding that Benjamin's full-scale IQ score "falls within the borderline range . . . ." Specifically, they point to Murphy's testimony that "Abildgaard . . . felt . . . that there was so much variability, there was so much going on with [Benjamin's] seizure disorder, attentional issues, that he didn't seem to be functioning in the intellectually disabled range but rather in the borderline range." The plaintiffs contend that Abildgaard's reference to Benjamin's score as falling within the borderline range is a scrivener's error. They point to a notation on a different page of Abildgaard's report indicating that his full-scale score fell within the classification "extremely low." Moreover, they argue that Abildgaard stated that Benjamin's full-scale IQ score is " 'consistent with his current adaptive functioning,' " which he had found to be within

the " 'low range.' "

We reject the plaintiffs' argument regarding Murphy's testimony. In his final decision, the commissioner directly quoted Abildgaard's statement, from the "Impressions" section of the report, that Benjamin's full-scale IQ score "falls within the borderline range . . . ." The final decision further references and discusses Abildgaard's finding and recommendations made in his report, rather than Murphy's testimony regarding that report. To the extent that the plaintiffs seek to challenge the commissioner's findings with respect to Abildgaard's statement on the basis of other statements included within the same report, we cannot conclude that the commissioner's findings were improper. "Neither [the appellate] court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact." (Internal quotation marks omitted.) *Christopher R.* v. *Commissioner of Mental Retardation*, supra, 277 Conn. 603.

Third, the plaintiffs challenge the commissioner's reliance on the subtest scores from the Abildgaard report, arguing that there was no record evidence to support the decision to analyze the subtest scores separate from the full-scale score. The plaintiffs distinguish our Supreme Court's approval, in *Christopher R.*, of separate examination of the subtest scores on two bases. First, they note that in *Christopher R.*, the department's decision to examine the subtest scores separately was supported by the Diagnostic and Statistical Manual of Mental Disorders, which provided that " '[w]hen there is significant scatter in the subtest scores, the profile of strengths and weaknesses, rather than the mathematically derived full-scale IQ, will more accurately reflect the person's learning abilities. When there is a marked discrepancy across verbal and performance scores, averaging to obtain a full-scale IQ score can be misleading.' " Id., 614. Second, they note that, in *Christopher R.*, "the clinical neuropsychologist at the Yale University School of Medicine who had administered the plaintiff's 1997 WISC-III test, found the broad disparity between the plaintiff's verbal and performance scores to be clinically significant." Id. The plaintiffs assert that, in contrast with *Christopher R.*, the department in the present case did not introduce any expert evidence to support its decision to examine separately Benjamin's subtest scores from his full-scale IQ score as set forth in the Abildgaard report.

The defendants respond, inter alia, that "[t]he plaintiffs misinterpret the holding in *Christopher R.* . . ." They maintain that the court in *Christopher R.* "did not limit the circumstances upon which [the department] could look to and rely upon subtest scores to those articulated by the plaintiff[s]." We agree with the defendants that the commissioner's consideration of addi-

tional evidence beyond Benjamin's full-scale IQ scores was supported by substantial evidence and did not run afoul of *Christopher R.* In noting that all but one of Benjamin's index scores on the WAIS-IV were in the borderline range, the commissioner expressly quoted from Abildgaard's discussion of the one score that fell below the borderline range, the PSI. With respect to that score, Abildgaard had explained that "[d]ifficulties in scanning large amount of visual stimuli and visual motor coordination may have impacted . . . [the PSI] results." This is akin to the evidence considered by the court in *Christopher R.* See *Christopher R.* v. *Commissioner of Mental Retardation*, supra, 277 Conn. 612 (discussing conclusions of psychologist who administered test regarding factors that had affected plaintiff's score).

Fourth, the plaintiffs argue in passing that the commissioner improperly treated as significant Abildgaard's reference to a 2013 psychoeducational evaluation. They point to the commissioner's finding: "Significantly, in the assessment, Dr. Abildgaard advised: 'For a more complete developmental history, the reader is encouraged to reference the psychoeducational evaluation conducted by Dr. Erik Mayville in 2013.' " The plaintiffs argue that Abildgaard's statement "merely recognizes that the Mayville assessment from 2013, already summarizes Benjamin's lengthy 'developmental history,' and there is no need for Abildgaard to repeat it in [his report]." Thus, they argue that "it is difficult to understand why this rather ordinary statement is 'significant.' " We fail to see how the commissioner's identification of this statement as significant is improper. To the extent that the plaintiffs are challenging the commissioner's judgment on the weight of that evidence, we are unable to substitute our own judgment for that of the commissioner on the weight of the evidence. See *Costello* v. *Commissioner of Developmental Services*, supra, 128 Conn. App. 290.

Accordingly, we conclude that the commissioner's decision was reasonably supported by substantial evidence in the record taken as a whole.

The judgment is affirmed.

In this opinion the other judges concurred.

* The defendants filed with the Superior Court a motion to seal portions of the administrative record containing confidential information. The Superior Court granted the motion.

[1] Pursuant to General Statutes § 1-1g (a), " 'intellectual disability' means a significant limitation in intellectual functioning existing concurrently with deficits in adaptive behavior that originated during the developmental period before eighteen years of age."

[2] In 2015, the legislature amended § 1-1g (a) to replace the term "mental retardation" with "intellectual disability," among other amendments that are not relevant to this appeal. See Public Acts 2015, No. 15-54, § 1.

[3] The plaintiffs additionally argue that the statutory phrase, "tests of general intellectual functioning," refers to the full-scale intelligence test results, as opposed to the subtest scores, which measure particular aspects of the applicant's IQ, such as verbal comprehension, perceptual reasoning, working memory, and processing speed. On the basis of the plaintiffs' proposed

construction of the statute, they maintain that the commissioner is not permitted to evaluate subtest scores separately when the applicant has presented a full-scale score below seventy. We disagree with the plaintiffs' construction of the statute. Rather, we find persuasive the defendants' response that the term "general" refers to the type of tests administered, specifically, those that measure general intellectual functioning. The inclusion of the word "general" in the statute does not prohibit the use of the subtest scores.

[4] The plaintiffs assert, in passing, two additional arguments. First, they assert in the alternative that, even if this court determines that the use of the plural term "tests" is significant, we should conclude that such term is used to indicate only that there are several different types of intelligence tests that can be used to measure "intellectual functioning." We disagree with the plaintiffs' interpretation, which, as the defendants emphasize, "presumes that only one test would ever be administered to an individual or presented to [the department] in support of an application for services." As the defendants state, there is nothing in the statute, as amended, that limits the number of tests that can be administered to an applicant and, indeed, the plaintiffs submitted the results of multiple tests, which were administered over a period of years, in support of their application. See *Christopher R.* v. *Commissioner of Mental Retardation*, supra, 277 Conn. 609 n.15 (noting that "it is not uncommon for persons seeking the department's services to have taken several intelligence tests").

Second, the plaintiffs point to the Superior Court's citation to § 1-1a, which addresses statutory interpretation of terms relating to security in personal property, and argue that it "has nothing to do with this case." The Superior Court stated: "According to the [department], § 1-1a requires the court to give a common meaning to the amended statute." It is clear that the Superior Court's reference to § 1-1a is a scrivener's error and the court intended to cite to General Statutes § 1-1 (a), which provides in relevant part that "words and phrases shall be construed according to the commonly approved usage of the language . . . ."

[5] In part V of this opinion, we examine the plaintiffs' related claim regarding whether the commissioner's decision to examine separately the subtest scores was supported by evidence in the record.

[6] The cases cited by the plaintiffs are distinguishable. See *Berka* v. *Middletown*, 181 Conn. App. 159, 162 and n.3, 185 A.3d 596 (Appellate Court took judicial notice of summons in Superior Court in action underlying appeal in resolving appeal from Superior Court's granting of motion to dismiss where service was not made on department), cert. denied, 328 Conn. 939, 184 A.3d 268 (2018), cert. denied,     U.S.    , 140 S. Ct. 479, 205 L. Ed. 2d 268 (2019); *Pierce* v. *Lantz*, 113 Conn. App. 98, 103 and n.1, 965 A.2d 576 (taking judicial notice of state regulations), cert. denied, 293 Conn. 915, 979 A.2d 490 (2009); *Lucarelli* v. *Freedom of Information Commission*, 29 Conn. App. 547, 550 and n.4, 616 A.2d 816 (1992) (taking judicial notice of other administrative appeals and civil action filed by same plaintiff in concluding that plaintiff's claim was moot), cert. denied, 225 Conn. 901, 621 A.2d 284 (1993).

[7] "Typically, judicial estoppel will apply if: [1] a party's later position is clearly inconsistent with its earlier position; [2] the party's former position has been adopted in some way by the court in the earlier proceeding; and [3] the party asserting the two positions would derive an unfair advantage against the party seeking estoppel. . . . We further limit judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain. . . . Thus, courts generally will not apply the doctrine if the first statement or omission was the result of a good faith mistake . . . or an unintentional error." (Citation omitted; internal quotation marks omitted.) *Assn. Resources, Inc.* v. *Wall*, 298 Conn. 145, 170, 2 A.3d 873 (2010).

[8] At the hearing before the hearing officer, Murphy testified with respect to Zuckerman's analysis that "Dr. Zuckerman felt that because of the extreme variability between the verbal index score, the verbal IQ score of 65 and the performance IQ score, he shouldn't rely on the full-scale IQ score. Instead he should calculate an alternate overall measure of intelligence, which is called a [GAI], and the [GAI] came out in the borderline range. It was the same as the full-scale IQ score."